* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Stanback and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Stanback, with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS
1. The employer/employee relationship existed at the time of the accident.
2. Becton Dickinson Company was the duly qualified employer at the time of the accident, and the insurance carrier was American Protection Insurance.
3. The parties are subject to the North Carolina Workers' Compensation Act, the employer employing the requisite number of employees to be bound under the provisions of said Act at the time of the alleged incident.
4. The plaintiff suffered an injury by accident on August 22, 2000.
5. As a result of said injuries, the plaintiff's left ring finger was amputated.
6. The plaintiff's average weekly wage is $900.00.
7. Documents stipulated into evidence include the following:
 a. Stipulated Exhibit #1 — Plaintiff's medical records;
 b. Stipulated Exhibit #2 — Plaintiff's medical and rehabilitation reports;
 c. Stipulated Exhibit #3 — Industrial Commission Forms; and
 d. Stipulated Exhibit #4 — Plaintiff's Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents.
* * * * * * * * * * *
 RULING ON EVIDENTIARY MATTERS
The objections raised in the depositions in this matter were OVERRULED by the Deputy Commission, and hereby upheld by the Full Commission. Additionally, the defendants' objections to the exhibits attached to plaintiff's briefs and contentions were OVERRULED by the Deputy Commissioner, and hereby upheld by the Full Commission.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. The plaintiff was born in Iraq, and was 36 years old on the date of the hearing before the Deputy Commissioner. The plaintiff has a degree in mechanical engineering from the University of Baghdad and has traveled to many countries throughout Europe and the Middle East, as well as many locations within the United States. The plaintiff worked for many years as a mechanical engineer, both in Iraq and the United States, possessing a high level of technical and computer skill and knowledge. He was employed with defendant-employer Becton-Dickinson as a mechanical engineer.
2. On August 22, 2000, the plaintiff sustained an injury by accident arising out of and in the course of his employment with the defendant-employer when he was repairing a press roller machine, and the machine unexpectedly malfunctioned and clamped down on his left hand. Defendants accepted compensability of the plaintiff's claim via Form 60. The plaintiff underwent approximately four surgeries, but ultimately had to have his left ring finger amputated. He is right-hand dominant. The plaintiff suffered no other long-term physical injuries; his physical injuries have completely healed, and he does not suffer any ongoing pain or physical difficulty with his left hand, other than the amputation.
3. The plaintiff developed psychological difficulties shortly after the event due to the trauma of the accident. Approximately one week after the injury, the defendants referred the plaintiff for psychological evaluation and treatment with Dr. Verne Schmickley, an expert in rehabilitation psychology, health psychology, and forensic psychology. Dr. Schmickley was the first mental health professional to see the plaintiff after his accident.
4. Dr. Schmickley's initial impression was that plaintiff had acute stress disorder from the incident, but because "he was a bright guy, highly educated, mechanical engineer, [with] a history of good jobs," Dr. Schmickley did not feel that returning to work would be a problem for plaintiff. Dr. Schmickley explained that the only individuals who normally have long-term affects of post traumatic stress disorder (PTSD) have been holocaust survivors, POW camp survivors, and people with similar experiences.
5. Dr. Schmickley saw the plaintiff for a total of seven visits, and the plaintiff made steady improvement. By the time of the plaintiff's last visit with Dr. Schmickley on October 18, 2000, the plaintiff stated that he had been active, doing better, and had even gone to the State Fair with no expression of concern for the injury to his finger. The fact that he was able to go to the State Fair indicated to Dr. Schmickley that the plaintiff was able to engage in regular activities and able to enjoy himself without worrying about the appearance or physical condition of his finger.
6. Dr. Schmickley confirmed that by mid-October 2000, the plaintiff was not making any complaints of nightmares, headaches, or flashbacks. He was not reporting any type of broad avoidant behavior (e.g., being bothered by every type of machine, or being worried by being afraid of his car). Plaintiff did not express any fear of driving cars. Plaintiff was not depressed, and he did not report withdrawing from his friends. Additionally, plaintiff made no mention of headaches, nausea, or photophobia. Dr. Schmickley recommended that the plaintiff go back to work as soon as possible because inactivity was not therapeutic for him.
7. The plaintiff abruptly terminated treatment with Dr. Schmickley after only seven of the ten authorized visits. The plaintiff requested that his treatment be transferred to Duke University Medical Center. He was seen at Duke by Dr. Handelsman on November 29, 2000, describing problems that he was not
complaining of just a few weeks before, including nightmares, broad avoidant behavior, being bothered by almost every type of machine including his cars, withdrawal from friends, and throbbing headaches with nausea and photophobia.
8. Dr. Handelsman prescribed medication and referred the plaintiff for counseling with therapist Linda Noyes. The plaintiff then began a long course of treatment with Dr. Handelsman and Ms. Noyes. He reported continuing symptoms throughout that treatment.
9. In April of 2001, the plaintiff indicated that he had run a marathon and was feeling markedly improved. Ms. Noyes and Dr. Handelsman suggested that the plaintiff try returning to work. The plaintiff then claimed at his next visit he had gotten sick just trying to drive to his workplace due to anxiety. Yet, at his visit shortly thereafter in June 2001, the plaintiff reported being able to travel to Europe and working on setting up his own e-mail business.
10. In July 2001, the plaintiff was evaluated by Dr. George Corvin, a psychiatrist. Dr. Corvin noted that the plaintiff was pleasant and cooperative during the examination and showed no evidence of malingering or symptom exaggeration. Dr. Corvin also noted that the plaintiff was a reliable historian and that his symptoms were markedly diminished. The plaintiff presented in such a way that led Dr. Corvin to believe that he was motivated to return to work, and Dr. Corvin recommended that he should try vocational rehabilitation in an effort to go back to work. In August of 2001, Dr. Levin, the plaintiff's orthopedic surgeon, also encouraged plaintiff to attempt to return to work and to participate in vocational rehabilitation.
11. The plaintiff thereafter made renewed complaints of supposedly severe psychological symptoms to Ms. Noyes in October 2001. His condition deteriorated steadily to the point that he had to be hospitalized on March 8, 2002, for dissociative symptoms and "bizarre things where he blacks out such as rolling his underwear, taping with duct tape, cutting up his clothes, throwing his furniture in the fireplace, saying he has lost checks. Has even traveled all over NC and Virginia and does not remember it."
12. However, the medical report from that date also noted evidence from an outside source that contradicted the plaintiff's claims of psychiatric symptoms. Dr. Peters, who evaluated the plaintiff, recorded: "Spoke with patient's girlfriend of two years, Angela Wright. She insists patient is simply lying and irresponsible. . . . She says that she had not noted any bizarre/dangerous behavior nor forgetfulness/blacking out."
13. Over the course of the next six months, the plaintiff's condition continued to deteriorate according to his reports to Dr. Handelsman and Ms. Noyes. Therefore, the defendants requested an evaluation by psychiatrist Dr. Robert Rollins on September 20, 2002.
14. Dr. Rollins is board certified in psychiatry and forensic psychiatry, and has treated patients for over thirty years, with a significant portion of this work involving the evaluation and treatment of patients with post traumatic stress disorder.
15. The most significant thing noted by Dr. Rollins during his evaluation of the plaintiff and upon review of his medical records, was the plaintiff's inconsistency of presentation. This included, but is not limited to, inconsistent reporting as to which one of his hands was dominant, whether or not he was married, being able to jog thirty to fifty miles a week, traveling to Europe and Italy and doing his taxes, but not acting functional during psychiatric treatment. Dr. Rollins noted that the plaintiff was not able to accurately give his own height and place of residence. The plaintiff also supposedly could not perform simple tasks such as repeating the numbers "1, 2, 3" or to solve the problem of five dollars minus twenty-five cents.
16. Dr. Rollins' opinion was, and the Full Commission finds as fact, that the plaintiff was exaggerating his impairment and malingering. Because of the plaintiff's failure to improve, Dr. Rollins felt that he needed to have a departure from his current treatment program. Dr. Rollins suggested observation in a structured setting over time, such as in a day-hospital setting.
17. Despite Dr. Rollins' recommendation, the plaintiff continued treatment with Dr. Handelsman and Ms. Noyes. The plaintiff continued making the same complaints of severe psychological problems to his treatment providers. He even claimed throughout the end of 2002 and into 2003 that others were having to feed him, bathe him, and take care of his finances.
18. Evidence outside of the reports of his treating mental health professionals revealed a much different story. The plaintiff owned a U-Haul storage facility in which he kept personal items and a large amount of electronic equipment. The storage unit flooded in March 2003, and plaintiff filed a property damage claim. On March 10, 2003, the same afternoon that plaintiff appeared "somnambulant, disoriented, and hallucinogenic" in his therapist's office, he gave an extremely lucid recorded statement only an hour or so later to Ms. Deanna Bates, the claims representative for the property damage claim regarding the storage facility. The Full Commission received and reviewed the audio tape of the statement and a transcribed copy of the statement as part of this claim.
19. During this recorded statement, the plaintiff was able to give a list of the items that were damaged as a result of the flooding in the storage unit. He even used his knowledge and skills as a mechanical engineer to explain what he thought had gone wrong with the storage unit's pumping system that ultimately caused the flooding problem. The plaintiff understood Ms. Bates' questions and, "listed right away what was damaged in his unit." Other than speaking with an accent, there was nothing unusual about the manner in which the plaintiff answered Ms. Bates' questions.
20. The storage unit property damage claim was then referred to Mr. Todd Stott, an independent appraiser with James C. Green Company in Raleigh. Mr. Stott met with the plaintiff alone two times at the storage unit to go through the contents and get descriptions. The substance of the meeting involved conversations about the property, working in a "relatively small space," maneuvering around to look at and photograph the items, as well as Mr. Stott asking the plaintiff questions about the items, such as their age, use, and purchasing information. The plaintiff did not have any difficulty responding to the questions he was asked.
21. Mr. Stott took pictures of the property, and plaintiff's hands appear in some of the pictures. Mr. Stott did not observe plaintiff guarding his left hand in any way. He did not put it behind his back, place it in his pocket, or attempt to conceal it.
22. Additionally, there were active discussions between the plaintiff and Mr. Stott over the actual cash value of the objects. Mr. Stott did not have concerns about the plaintiff's competency to participate in the claims investigation process. After Ms. Bates received the appraisal list from Mr. Stott, she discussed settlement with the plaintiff, and the two of them reached an agreed upon amount of just over $8,000.00.
23. Dr. Schmickley expressed the opinion, to which the Full Commission gives great weight, that the plaintiff's behavior in the recorded statement was not consistent with the behavior presented to Ms. Noyes. Such inconsistent behavior supports a diagnosis of malingering. Dr. Schmickley also stated that the type of behavior he reviewed in the recorded statement was exactly what he had expected the plaintiff would be capable of doing as of the time he last saw him in 2000. Dr. Schmickley stated, "That's what I predicted, that he would be able to function and — gainful employment, negotiate contracts, take care of business transactions and conflicts."
24. Dr. Rollins also compared the notes of Ms. Noyes from March 10, 2003, with the recorded statement that the plaintiff gave to Deanna Bates in his property damage claim that same afternoon. Dr. Rollins contrasted how during the office visit with Ms. Noyes, the plaintiff was supposedly semi-conscious and disoriented in terms of time, person, place, and circumstance. Yet, after an hour later during the recorded statement, he was able to have "a coherent transaction, provide many details, and indicate that he absolutely has a business and that he goes to this location practically everyday," when describing the property and damage done at the U-Haul facility.
25. Dr. Rollins stated that from a clinical perspective, the plaintiff's behavior was "significantly different", and "[t] that would be consistent with the concept that [the plaintiff] is exaggerating his symptoms to the treating people and would be consistent with now diagnosis of malingering."
26. Dr. Rollins also examined a letter from Mr. Todd Stott, the independent appraiser involved in the property damage claim, dated April 4, 2003. Dr. Rollins explained that this letter indicated the plaintiff was able to communicate, function, and even travel from Raleigh to Washington, D.C. — all behaviors inconsistent with what plaintiff was reporting to his medical providers. This information further supports Dr. Rollins' diagnosis of malingering. Dr. Rollins then contrasted the level of functioning indicated in the letter from Mr. Stott dated April 29, 2003, as compared with the plaintiff's treatment with Ms. Noyes on April 21 and 29, 2003. Dr. Rollins noted that the plaintiff's interactions with Mr. Stott indicated a relatively high level of functioning regarding the property damage claim while at the same time the plaintiff was reporting a much different level of functioning to his medical providers.
27. Around this same time in spring 2003, Mr. John B. Jarema, vocational rehabilitation professional, certified rehabilitation counselor and licensed professional counselor with Broadspire, was assigned to provide vocational rehabilitation services to the plaintiff. He first met with plaintiff on March 25, 2003.
28. Mr. Jarema did not have any trouble communicating with the plaintiff in English. However, he reported that the plaintiff was extremely evasive and non-cooperative in providing information about his education, background experience, previous places of residence, and background prior to coming to the United States. The plaintiff was supposedly unable to recall if he spoke any foreign languages. Because of the plaintiff's claimed inability to remember information and provide answers to even the simplest kinds of questions, Mr. Jarema thought that beginning traditional direct job search activities would not be appropriate at that time. Therefore, he referred the plaintiff to the Raleigh Vocational Center. Mr. Jarema made an appointment for an initial meeting at the Center, but the plaintiff did not appear for the appointment.
29. Mr. Jarema continued to attempt to meet with the plaintiff; however, the plaintiff made it difficult to schedule appointments. Mr. Jarema felt that transitional employment at the Raleigh Vocational Center would be a good first step for the plaintiff. Furthermore, Mr. Jarema spoke with the plaintiff's therapist, Linda Noyes, by telephone, and Ms. Noyes approved of the plan to return the plaintiff to work.
30. In May 2003, and apparently without knowing about the plaintiff's interactions with the property damage claim and travel in March and April, Dr. Handelsman wrote that the plaintiff would be permanently disabled and could not even participate in the lowest level of a sheltered workshop. Thereafter, the plaintiff refused to undergo any further vocational rehabilitation.
31. Dr. Rollins disagreed with Dr. Handelsman's statement that the plaintiff could not work, because ability to work depends on the plaintiff's actual level of functioning, and the independent sources of information as discussed herein indicate that the plaintiff's level of functioning is much higher than what he reported to Dr. Handelsman. Dr. Rollins felt that if the plaintiff were motivated to return to work that he would be able to do so. Dr. Rollins expressed his opinion to a reasonable degree of medical certainty as an expert psychiatrist that the plaintiff was more likely than not malingering. He explained that, "Malingering is the intentional exaggerating of symptoms to gain some benefit." His opinion was that the plaintiff's malingering was more likely than not willful and conscious. Dr. Rollins also found that the plaintiff had reached maximum medical improvement as of the date of his evaluation of September 20, 2002.
32. Dr. Schmickley disagreed with Dr. Handelsman's notation that the plaintiff was unable to work and unlikely to improve even to the point where he could work in a sheltered workshop. Dr. Schmickley recommended a change of treatment away from the doctors at Duke. He saw no reason that the plaintiff could not be gainfully employed, and he opined that the plaintiff was more likely than not capable of returning to work if he were motivated to do so.
33. Additionally, Dr. Schmickley did not think that the plaintiff's presentation was consistent with post traumatic stress disorder. He stated that malingering was a definite possibility, especially considering the outside evidence of ability to function that was inconsistent with his clinical presentations.
34. Subsequently, the employer scheduled an independent medical evaluation of plaintiff with Dr. Thomas Gualtieri to see if anything different could be done for the plaintiff to help him recover. The plaintiff refused to attend the appointment. Dr. Gualtieri is board certified in psychiatry and child and adolescent psychiatry. Dr. Gualtieri receives 10 to 12 patients per year with post traumatic stress disorder and he has been involved in two clinical trials to evaluate the cognitive problems of post traumatic stress disorder patients.
35. As an alternative to an office visit, Dr. Gualtieri performed a medical record review and generated a report dated May 19, 2003. Dr. Gualtieri felt that the treatment the plaintiff was undergoing with Dr. Handelsman and Ms. Noyes was not helping him. He also noted that there were "disconnects" between the plaintiff's reported symptoms and his actual level of functioning, including things like having girlfriends, visiting Europe, and starting an e-mail business. Dr. Gualtieri also described plaintiff's behavior as "childlike" and "nonsensical," and the antipsychotic medication treatment and recommendation for attendant care was an extraordinary development and the kind of event one would expect from a patient with schizophrenia or a neurodegenerative disease.
36. Regarding plaintiff's diagnosis, Dr. Gualtieri stated that the best he could do without seeing a patient was a differential diagnosis with several possible conditions. First was PTSD, the second was that plaintiff had some other kind of serious psychiatric illness, the third was that plaintiff had a neurodegenerative disorder, the fourth possibility was a conversion disorder or hysteria, and the fifth possibility was that plaintiff was malingering. However, in analyzing these possibilities, Dr. Gualtieri explained that patients with severe PTSD do not travel to Europe, get new girlfriends, start new businesses, etc., as the plaintiff was able to do. He explained that in individuals with genuine disability from PTSD, "the disability extends to every aspect of a patient's life." However, Dr. Gualtieri said that without first seeing the plaintiff he would not be able to form an opinion about which of these differential diagnoses was correct.
37. Dr. Gualtieri recommended that the plaintiff consider a new treatment approach. He explained that his practice has a specialized treatment program for PTSD that is not available anywhere else in North Carolina. The program treats patients not only with medications and therapy, but also with active involvement in the real world and community with a goal towards getting patients back to a functional level in society. This recommendation was consistent with the testimony of Dr. Schmickley and Dr. Rollins. Dr. Schmickley recommended aggressive cognitive behavioral therapy, which he described as treatment designed to return a patient to normal functioning as opposed to just letting the patient talk. Dr. Rollins suggested observation in a structured setting over time, such as in a day-hospital.
38. The plaintiff continued treating with Dr. Handelsman and Ms. Noyes. His reports of symptoms did not improve.
39. The plaintiff testified at the hearing before the Deputy Commissioner and offered the testimony of family members and associates. The plaintiff presented in a confused and bizarre manner similar to that noted in the treatment records of Dr. Handelsman and Ms. Noyes. He claimed that he was not able to work in any employment. However, the Full Commission does not find the plaintiff's testimony to be clear and convincing evidence of his disability. The behavior exhibited by the plaintiff at the hearing was exaggerated, and, according to the testimony of the mental health experts in this case, not consistent with a genuine case of post traumatic stress disorder.
40. Neither Dr. Handelsman nor Ms. Noyes was called by the plaintiff to testify. Subsequent to the hearing, Dr. Handlesman passed away unexpectedly and Ms. Noyes went out of work on medical leave. Dr. Handelsman could have been deposed prior to his death but was not. There is no evidence that either provider had knowledge about the plaintiff's inconsistent behavior with plaintiff's storage space property claim in March and April 2003. Furthermore, there is no evidence that they considered the claims of the plaintiff's girlfriend that plaintiff was lying, or attempted to investigate the possibility that the plaintiff was exaggerating his symptoms, like Drs. Schmickley and Rollins stated should have been done.
41. Having reviewed all the evidence of record, the Full Commission finds that the greater weight of the evidence establishes that the plaintiff is no longer disabled from PTSD resulting from his compensable injury by accident on August 22, 2000. There is no evidence that the plaintiff is prevented from working due to pre-existing factors such as age, education, or employment experience. Plaintiff is young, highly educated, and has experience in technical, skilled fields of employment including mechanical engineering. There is no evidence that the plaintiff's physical condition prevents him from earning the same or greater wages in competitive employment. The greater weight of the evidence establishes that, by the time of the filing of the Form 24 in this matter, the plaintiff was capable of earning the same or greater wages in competitive employment from a physical and mental perspective. No Form 21 or Form 26 was filed in this case, and the plaintiff did not prove entitlement to ongoing disability, either by his testimony or that of the medical evidence. The plaintiff has been capable of earning the same or greater wages in competitive employment since the filing of the Form 24 Application.
42. Although the plaintiff did sustain a compensable injury by accident for which the defendants properly admitted liability under the Workers' Compensation Act, the totality of the evidence indicates that the plaintiff has materially misrepresented the nature of his condition for an unknown period of time. The greater weight of the evidence establishes that plaintiff's PTSD had improved to the point that he was not in need of any additional medical treatment to either effect a cure, give relief, or lessen the period of his disability after the filing of the Form 24 in this matter, including attendant care or assisted living.
43. The defendants filed a Form 24 Application on September 26, 2003. The plaintiff responded and the record for the action was complete as of December 8, 2003, with the Industrial Commission having received additional supporting documentation from the plaintiff to supplement his response. The Form 24 request to stop payment was improvidently denied by the Industrial Commission. The plaintiff's refusal to undergo the evaluation with Dr. Gualtieri was not reasonable and justified under the circumstances. The basis for the Form 24 denial was that the plaintiff had not been previously ordered to comply with medical treatment and vocational rehabilitation, but in fact he had been ordered to do so, based on an Order filed October 14, 2002, by Executive Secretary Tracey Weaver. Appearing for the scheduled appointment with Dr. Gualtieri would have provided additional information regarding the plaintiff's perceived disability and his ability to return to work. Had plaintiff complied, the necessary information could have been gathered to fully assess the plaintiff's condition, appropriate recommendations could have been made and acted upon, and appropriate vocational rehabilitation plans could have been developed. Based on the plaintiff's unjustified refusal to cooperate as ordered, and based on the overwhelming evidence in the record that plaintiff is malingering and exaggerating his symptoms, the defendants are entitled to terminate plaintiff's ongoing compensation, effective September 26, 2003, the date the defendants filed the Form 24 in this matter. The defendants are entitled to a credit for compensation paid since that date. This termination of ongoing benefits does not preclude the plaintiff from his entitlement to any permanent partial disability compensation.
44. As a result of his compensable injury by accident, according to Dr. Levine, the plaintiff retains at least a thirty percent (30%) permanent partial disability to his left hand.
45. The plaintiff is not permanently and totally disabled.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The plaintiff has failed to show that his continues to be disabled as a result of his compensable injury by accident of August 22, 2000, as defined under the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-2(9).
2. The plaintiff has failed to show that he is permanently and totally disabled. N.C. Gen. Stat. § 97-29.
3. The Form 24 request to stop payment of compensation was improvidently denied. N.C. Gen. Stat. § 97-18.
4. The defendants are entitled to cease payment of all compensation to the plaintiff, effective September 26, 2003, including ongoing indemnity compensation and medical treatment, and the defendants are entitled to a credit for all indemnity compensation paid to the plaintiff after that date. N.C. Gen. Stat. §§ 97-18, 97-25.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. The plaintiff's claim for additional medical treatment and/or compensation benefits is hereby DENIED. The defendants may terminate payment of benefits effective September 26, 2003.
2. The defendants shall receive a credit for any indemnity benefits paid to the plaintiff after September 26, 2003.
3. Each party shall bear its own costs.
This the 8th day of May 2006.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 CONCURRING: S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ DIANNE C. SELLERS COMMISSIONER